## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:25-cv-01950-PAB-NRN

**CASSANDRA KLINE,** a deceased individual,
**ESTATE OF CASSANDRA KLINE**, by and through Personal Representative, Heather Kline-Hill; and
**HEATHER KLINE-HILL**, an individual and mother and heir of Cassandra Kline,

   Plaintiffs,

  v.

**TURN KEY HEALTH CLINICS, LLC**;
**BOARD OF COUNTY COMMISSIONERS, WELD COUNTY**;
**WELD COUNTY SHERIFF STEVE REAMS**, in his official capacity;
**VERA THOMPSON**, individually;
**KRISTINA MAST**, individually;
**BRITTANI FLORES**, individually;
**STARR GRAHAM**, individually;
**JOHN OR JANE DOES 1-5**, Turn Key medical providers;
**JAKOB BOWERS**, a Weld County Sheriff's Deputy;

**GRANT HAWKINS**, a Weld County Sheriff's Deputy;

and
**JOHN OR JANE DOES 8-10**, Weld County Sheriff Deputies,

   Defendants.

---

### THIRD AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiffs, through their attorneys, Ogborn Mihm, LLP, hereby submit their Third Amended Complaint and Jury Demand against Defendants and state as follows:

## I.  INTRODUCTION

1.      Cassandra Alexandra Kline was 26 years old when she died in a Weld County Jail holding cell from alcohol withdrawal on June 24, 2023.

2.      Ms. Kline's death was completely avoidable and unnecessary.  Ms. Kline died because the Defendants failed to provide her with any medications or medical treatment for her obvious and ongoing alcohol withdrawal while in their custody.

3.      Ms. Kline was a Colorado native, and she attended Monarch High School in Louisville, Colorado.

4.      After high school, Ms. Kline worked as a waitress for about five years at the Benihana restaurant and then the Gordon Biersch restaurant, both in Broomfield, Colorado.

5.      Ms. Kline always maintained a close relationship with her mother, Plaintiff Heather Kline-Hill.

6.      Unfortunately, to cope with a series of traumas in her life, Ms. Kline began heavily drinking alcohol when she was in her teens.

7.      Ms. Kline had been repeatedly diagnosed by her medical providers with Alcoholism.

8.      Alcoholism has been formally recognized as a disease by the American Medical Association since 1956.

9.      By June of 2023, Ms. Kline had been a severe alcoholic for a decade and drank vodka heavily every day.

10.     But Ms. Kline was trying to turn her life around.  Prior to her death, in the early Summer of 2023, with the help of her primary care physician, Ms. Kline had begun efforts to enter an alcohol dependency treatment program, though she had not yet stopped drinking heavily on a daily basis.

11.     During the early morning of June 24, 2023, at about 5:45 a.m., Ms. Kline and her boyfriend were both arrested by Lochbuie police department officers at their residence in Weld County, Colorado after a domestic dispute.

12.     At the time of her arrest, Ms. Kline and Ms. Kline's mother, Plaintiff Heather Kline-Hill, specifically told the arresting officers that Ms. Kline was a serious alcoholic who would undergo alcohol withdrawal in jail.

13.     At the time of her arrest, while sitting in a law enforcement vehicle, Ms. Kline began to experience symptoms of alcohol withdrawal.

14.     An ambulance was summoned by Lochbuie police officers to take Ms. Kline to Platte Valley Hospital for evaluation and treatment of her alcohol withdrawal symptoms.

15.     The medical records from Platte Valley Hospital state, in part, "Cassandra Alexandra Kline is a 26 yr female who presents for concern of alcohol withdrawal. Patient states she has had a history of alcohol withdrawal previously, that resulted in seizures, and intubation."

16.     Platte Valley Hospital discharged Ms. Kline back into the custody of law enforcement at about 9:53 a.m. with written prescriptions and instructions from a

3

physician that she be provided with benzodiazepine medications as treatment for her known on-going alcohol withdrawal.

17. Ms. Kline was then booked into Weld County Jail at about 12:12 p.m. on June 24, 2023.

18. The medical staff at the Weld County Jail were handed copies of the physician's written prescriptions and instructions that Ms. Kline be provided with Benzodiazepine medications as treatment for her known on-going alcohol withdrawal.

19. During Ms. Kline's initial medical intake at the Weld County Jail, the medical staff stated in their medical records that she was at high risk of potentially deadly alcohol withdrawal and that she was currently experiencing: (a) "Auditory hallucinations "related to alcohol withdrawal"; (b) "Tremors"; and (c) "Constant nausea, frequent dry heaves and vomiting." And that Ms. Kline was "seen at hospital for alcohol intoxication/withdrawal prior to booking."

20. The initial intake medical records at Weld County Jail, which were entered at 1:58 p.m., also stated that Ms. Kline drank "Vodka- 10-20 shots daily" and that her last drink had been at 5:00 a.m. that morning (nine hours prior). Medical staff at the Weld County Jail placed Ms. Kline on "Withdrawal/Detox Monitoring"

21. Alcohol withdrawal symptoms can be, and normally are, safely and easily managed in a jail setting through the administration of Benzodiazepine medications.

4

22.    Left untreated, however, alcohol withdrawal symptoms can be deadly.

23.    While at Weld County Jail on June 23, 2024, Ms. Kline never received any medications or treatment at all for her alcohol withdrawal symptoms, and as a result she progressively deteriorated in the holding cell.

24.    Defendants did not provide any medical evaluations to Ms. Kline after the chart entries at 2:08 pm, nor did the Defendants ever provide Ms. Kline with the lifesaving benzodiazepine withdrawal medications she needed.

25.    At 6:42 pm, another inmate in the cell with Ms. Kline (Ms. Barbara Guzman) began pounding on the cell door to summon help for Ms. Kline because Ms. Kline was having an alcohol withdrawal seizure and breathing problems.

26.    At that time, Defendant Deputy Bowers walked over to the cell and Ms. Guzman told Defendant Deputy Bowers through the cell door  that Ms. Kline was having seizures, breathing oddly like an asthma attack, was writhing, stiff, , and laying halfway off her bunk (*i.e.* having alcohol withdrawal induced seizures).

27.    Defendant Deputy Bowers disregarded Ms. Guzman's plea for help for Ms. Kline, saying, "That's normal," and did not turn on the lights inside the cell to clearly observe Ms. Kline, did not open the cell to check on Ms. Kline, and walked away despite his knowledge that she was experiencing severe alcohol withdrawal.

28.    Defendant Deputy Bowers testified during his May 5, 2026 deposition in this case that when he looked through the window into the darkened cell at 6:42 p.m. after Ms. Guzman banged on the cell door to summon help for Ms. Kline, he

5

could see that Ms. Kline was "shivering", "moaning" and "tossing and turning" [i.e.-having a seizure].

29.     The subsequent death investigation by the Greeley Police Department determined that "At 6:42 p.m., Inmate Barbara Guzman alerted [Defendant Deputy] Bowers to Cassandra's seizures. She was writhing, stiff, breathing oddly, and laying halfway off the bunk. According to Barbara, [Defendant Deputy] Bowers blew her off."

30.     The subsequent death investigation by the Greeley Police Department determined that the Weld County Deputies' checks on Ms. Kline were "apathetic; lackadaisical at best," and that there was as much as an hour between safety checks on Ms. Kline by the Deputies (which are required to be at fifteen-minute intervals).

31.     Detective Chris Onderline, the Greeley Police Department Detective who led the subsequent death investigation, testified during his May 12, 2026 deposition in this case, that with regard to Ms. Kline, Defendants Deputies Bowers and Hawkins were "disinterested", "lazy", "insufficient" and showed "negligence."

32.     Deputy Defendants Bowers and Hawkins were both disciplined in writing by Weld County Sheriff's Office for their roles in Ms. Kline's death.

33.     Predictably, the worst occurred, staff found Ms. Kline dead in the Weld County Jail holding cell at about 8:00 pm.

6

34.    As the subsequent investigation put it: Deputy Hawkins "found Cassandra unresponsive, still lying halfway off the bunk, just as she was an hour earlier when [her cellmate] alerted [Defendant Deputy] Bowers."

35.    Ms. Kline was booked into the Weld County Jail at about 12:12 p.m., already exhibiting symptoms of severe alcohol withdrawal that required immediate medications and medical treatment.  Defendants, however, failed to provide Ms. Kline with any medications or medical treatment for about seven hours, and ignored her obvious ongoing seizures and the pleas of her cellmate to help her, until she was found dead in a jail cell at about 8:00 pm.

36.    Subsequently, an autopsy was conducted at the Weld County Coroner's Office, and it was determined that "[b]ased on the history provided and the autopsy findings, the likely cause of death is an **ethanol [alcohol] withdrawal related seizure**." (emphasis added).

37.    Defendants knew that Ms. Kline was in the midst of severe and potentially deadly alcohol withdrawal, they knew she was in the midst of a seizure an hour before discovering her dead, and yet they negligently, recklessly, and with deliberate indifference to life and rights of Ms. Kline failed to do anything at all to save her.

38.    As a direct result of Defendants' deliberate indifference, Ms. Kline died on the bottom bunk of her jail cell at age 26 from an entirely preventable alcohol withdrawal related seizure.

7

## II. PARTIES

39.    At all relevant times, the decedent, Cassandra Alexandra Kline, was a resident of Colorado and a citizen of the United States of America.

40.    Cassandra Kline never had children and was never married.

41.    Plaintiff Heather Kline-Hill is the mother and heir of the decedent Cassandra Alexandra Kline.

42.    The Estate of Cassandra Kline has been filed in Weld County, Colorado, and the personal representative of the Estate is Ms. Kline's mother, Plaintiff Heather Kline-Hill.

43.    Plaintiff Heather Kline-Hill is a resident of Colorado and a citizen of the United States of America.

44.    The Defendant Board of County Commissioners, Weld County, Colorado (BOCC) is a governmental entity chartered under the laws of the State of Colorado, located at 1150 O Street, Greeley, Colorado. Among other things, BOCC, through the Weld County Sheriff's Office ("Sheriff"), operates the Weld County Jail located at 2110 O Street, Greeley, CO 80631. Defendant BOCC represents, oversees, and sets policy for Weld County Colorado and contracted with Turn Key Health Clinics, LLC or Turn Key Health Clinics' Successors to fulfill its Constitutional obligation to provide health care to the inmates at the jail.

45.    Defendant Steve Reams, in his official capacity, is the Weld County Sheriff, with an address of 1950 O Street, Greeley, CO, 80631. Sheriff Reams is a

8

final policy maker for Weld County with respect to all matters concerning the Sheriff's Office and all of its divisions, including the Weld County Jail.

46.     The Weld County Sheriff and the BOCC are collectively referred to herein as the "County Defendants."

47.     The County Defendants have a duty under 42 U.S.C. § 1983 to provide constitutionally adequate care, cannot contract away their constitutional obligations, and are legally liable for their own challenged deliberately indifferent polices, practices, customs, and lack of training.

48.     The County Defendants are proper defendants under 42 U.S.C. § 1983. Although the County Defendants have privatized the provision of healthcare services in the Weld County Jail by contracting with the Turn Key Defendants to provide such services, the County Defendants have a non-delegable duty under 42 U.S.C. § 1983 to provide constitutionally adequate care, cannot contract away their constitutional obligations, and are legally liable for the challenged deliberately indifferent polices, practices, customs, and training by such private contractors.

49.     The intent of the following paragraphs relating to the "Turn Key" entities is to identify all corporate entities with which the County Defendants contracted and/or with which subcontracts were made, to provide medical care to the inmates at the Weld County Jail during the period in question.

50.     If, unbeknownst to Plaintiffs at this time, the County Defendants contracted with different unnamed corporate entities to provide medical services at

9

the Weld County Jail for the relevant period in June 2023, such separate independent entities to whom Weld County's non-delegable duty have been contractually conveyed will be substituted for the entities described below.

51.    At all relevant times, Defendant Turn Key Health Clinics, LLC, was a private Oklahoma "for profit" corporation doing business in Colorado with its principal address located at 900 NW 12th Street, Oklahoma City, OK, with its registered agent in Colorado at InCorp Services, Inc., 36 South 18th Avenue, Suite D, Brighton, CO 80601.

52.    At the time of the conduct at issue in this case, the individual health care provider Defendants Thompson, Mast, Flores, Graham, and John and Jane Does 1-5 were acting as employees and/or agents of Defendant Turn Key Health Clinics, LLC.

53.    Defendant Turn Key Health Clinics, LLCis sometimes referred to herein as "Turn Key" or "Turn Key Defendants."

54.    Defendant Turn Key Health Clinics, LLC is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff with respect to the provision of medical care and treatment for inmates. Upon entering into contracts or subcontracts to provide medical and/or other services to Weld County inmates, Turn Key assumed public functions, acted under color of state law, and is legally responsible to comply with all requirements of the United States Constitution.

10

55.     The County Defendants and Defendant Turn Key Health Clinics, LLC are collectively referred to herein as the "Entity Defendants".

56.     Defendant Turn Key Health Clinics, LLC is properly sued for its own negligence and the negligence of its agents and employees under Colorado State Law because Turn Key is a private entity.

57.     Defendant RN Vera Thompson was a citizen of the United States and a resident of Colorado. Defendant Thompson was an agent, employee, and/or subcontractor of Turn Key and was responsible for providing medical care to Ms. Kline during her detention. At all relevant times, Defendant Thompson was acting under color of state law.

58.     Defendant RN Kristina Mast was a citizen of the United States and a resident of Colorado. Defendant Mast was an agent, employee, and/or subcontractor of Turn Key and was responsible for providing medical care to Ms. Kline during her detention. At all material times, Defendant Mast was acting under color of state law.

59.     Brittani Flores was a citizen of the United States and a resident of Colorado. Defendant Flores was an agent, employee, and/or subcontractor of Turn Key and was responsible for providing medical care to Ms. Kline during her detention. At all material times, Defendant Flores was acting under color of state law.

60.     Starr Graham, a licensed nurse practitioner, was a citizen of the United States and a resident of Alabama. Defendant Graham was an agent, employee, and/or subcontractor of Turn Key and was responsible for providing medical care to Ms.

11

Kline during her detention. At all material times, Defendant Graham was acting under color of state law.

61.    Upon information and belief, John and Jane Does 1-5 were citizens of the United States and residents of Colorado. Defendants John and Jane Does 1-5 were agents, employees, and/or subcontractors of Turn Key and were responsible for providing medical care to Ms. Kline during her detention. At all material times, Defendants John and Jane Does 1-5 were acting under color of state law.

62.    Defendants Thompson, Mast, Flores, Graham, and John and Jane Does 1-5 are sometimes hereafter referred to as "Individual Medical Defendants."

63.    Upon information and belief, John and Jane Does 8-10 were citizens of the United States and residents of Colorado. Defendants John and Jane Does 8-10 were Weld County Sherriff Deputies and were responsible for booking Ms. Kline, ensuring her safety, and/or facilitating medical care to Ms. Kline during her detention. Defendants John and Jane Does 8-10 were corrections officers in the State of Colorado. At all material times, Defendants John and Jane Does 8-10 were acting under color of state law.

64.    On July 1, 2025, Plaintiffs received the death investigation incident report from the Greeley Police Department regarding Ms. Kline's death (the "Incident Report").

65.    Defendant Jakob Bowers was identified in the Incident Report as one of the "swing shift" booking deputies who was assigned to the Weld County Jail on June 24, 2023.

66.    Defendant Jakob Bowers was and is a citizen of the United States and resident of Colorado. Defendant Bowers was and is a Weld County Sherriff Deputy and was responsible for monitoring and checking on Ms. Kline, ensuring her safety, and/or facilitating medical care to Ms. Kline during her detention. Defendant Bowers is and was a POST certified peace officer in the State of Colorado. At all material times, Defendant Bowers was acting under color of state law.

67.    Defendant Grant Hawkins was identified in the Incident Report as one of the "swing shift" booking deputies who was assigned to the Weld County Jail on June 24, 2023.

68.    Defendant Grant Hawkins was and is a citizen of the United States and resident of Colorado. Defendant Hawkins was and is a Weld County Sherriff Deputy and was responsible for monitoring and checking on Ms. Kline, ensuring her safety, and/or facilitating medical care to Ms. Kline during her detention. Defendant Hawkins is and was a POST certified peace officer in the State of Colorado. At all material times, Defendant Hawkins was acting under color of state law.

69.    Defendants John and Jane Does 8-10 and Defendants Bowers and Hawkins are hereafter referred to as "Individual Deputy Defendants."

13

70.     Together, the Individual Medical Defendants and the Individual Deputy Defendants are referred to as the "Individual Defendants."

## III.  JURISDICTION AND VENUE

71.     This case arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988. This Court's jurisdiction is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

72.     This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

73.     Supplemental jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

74.     The state law claims in this matter are brought against private corporations or pursuant to express exceptions to statutory immunity, and therefore no notice of claims was required under the Colorado Governmental Immunity Act (CGIA).

## IV.  STATEMENT OF FACTS

### Ms. Kline's arrest during the early morning of June 24, 2023

75.     Cassandra Kline was arrested on the morning of June 24, 2023, by law enforcement officers in Weld County, Colorado

14

76.     During the early morning of June 24, 2023, at about 5:45 a.m., Ms. Kline and her boyfriend were both arrested on charges of domestic violence by Lochbuie police department officers at their residence in Weld County, Colorado after a domestic dispute.

77.     At the time of the arrest, Plaintiff Kline-Hill spoke on the phone with the arresting officer and informed him that her daughter Ms. Cassandra Kline suffered from chronic alcohol addiction and that Ms. Kline was at risk for alcohol withdrawal if she was detained.

78.     Ms. Kline herself also informed the arresting officer that she suffered from chronic alcohol addiction and that she was at risk for alcohol withdrawal if she was detained.

79.     At the time of her arrest, while sitting in a law enforcement vehicle, Ms. Kline began to experience symptoms of alcohol withdrawal.

80.     An ambulance was summoned by Lochbuie police officers to take Ms. Kline from the scene of her arrest to Platte Valley Hospital for her alcohol withdrawal symptoms.

81.      Ms. Kline arrived at Platte Valley Hospital via ambulance at about 7:08 a.m.

82.     The medical records from Platte Valley Hospital state, in part, "Cassandra Alexandra Kline is a 26 yr female who presents for concern of alcohol

15

withdrawal. Patient states she has had a history of alcohol withdrawal previously, that resulted in seizures, and intubation."

83.     At about 7:20 a.m., the medical providers at Platte Valley Hospital administered a Clinical Institute Withdrawal Assessment for Alcohol ("CIWA-Ar") assessment to Ms. Kline to determine the severity of her known ongoing alcohol withdrawal.

84.     Ms. Kline's CIWA-Ar score at 7:20 a.m. was "3", consistent with more mild symptoms of withdrawal because, as Ms. Kline told medical providers, her last drink had been at about 5:00 a.m. that morning.

85.     Ms. Kline told medical providers at the hospital that she was not pregnant, was on depo-provera birth control, and a pregnancy blood test showed Ms. Kline and the medical providers at 8:23 a.m. that she was not pregnant.

86.     By 9:53 a.m., the medical providers at Platte Valley Hospital determined that Ms. Kline could be discharged from the hospital to be incarcerated but also determined that Ms. Kline needed to be provided with benzodiazepine medications and treatments for her alcohol withdrawal by medical personnel at the jail once she was incarcerated.

87.     The medical providers at Platte Valley Hospital did not provide Ms. Kline with medications to treat her alcohol withdrawal while she was at Platte Valley Hospital because her alcohol withdrawal symptoms had not yet progressed from mild

16

to moderate and/or severe because her last drink had been at about 5:00 a.m. that morning.

88.    Ms. Kline was discharged from Platte Valley Hospital at about 9:53 a.m. with written instructions that she be provided with benzodiazepines and other medications to treat her known and on-going alcohol withdrawal once she was incarcerated.

89.    At that time, about 10:00 a.m., Ms. Kline was driven by a law enforcement officer to the Lochbuie Police Station and from there to the Weld County Jail.

***Defendants knew that Ms. Kline was already experiencing severe alcohol withdrawal at the time she was booked into the Weld County Jail***

90.    Ms. Kline arrived at the Weld County Jail at approximately 12:12 p.m. on June 24, 2023.

91.    At all relevant times after she was booked, Ms. Kline was a pre-trial detainee at the Weld County Jail.

92.    As of June 2023, the County Defendants had previously contracted with Turn Key to provide correctional healthcare services for inmates at the Weld County Jail.

93.    The County Defendants had and were paying Turn Key millions of dollars to provide such medical services.

94.    Turn Key was providing medical care services at the Weld County Jail pursuant to such contract on June 24, 2023.

17

95.     A common and recurring problem among inmates in jails generally, and the Weld County Jail specifically, is alcohol dependency and alcohol withdrawal.

96.     Evaluating and addressing the needs of inmates with alcohol dependency and alcohol withdrawal, as well as associated medical conditions, is a usual and recurring task for health care workers in the Weld County Jail. "Health care workers," as used herein, means Registered Nurses ("RN"), Licensed Practical Nurses ("LPN"), and Nurse Practitioners ("NP"), and any other health care providers.

97.     All reasonable jail health care workers are aware that alcohol dependency and alcohol withdrawal are common among inmates.

98.     All reasonably trained deputies are also aware that alcohol dependency and alcohol withdrawal are common among inmates.

99.     Fortunately, alcohol withdrawal is easily treatable with medical intervention.

100.    If untreated, however, alcohol withdrawal can be fatal, and this is known to all reasonable health care workers and deputies.

101.    Given the significant risk of death associated with alcohol withdrawal, every jail health care worker must be able to recognize the signs and symptoms of alcohol withdrawal and understand how to promptly treat it.

102.    At about 12:17 p.m., upon her arrival at the jail, the initial medical check conducted by Defendant Thompson in the booking area was captured on the body cam

18

video of the Lochbuie Police Department Officer who had transported Ms. Kline to Weld County Jail.

103.    During the initial medical check in the booking area, Ms. Kline can be seen lying on a steel bench, vomiting into a green plastic bag, displaying signs of physical sickness, behaving lethargically, and appearing physically ill.

104.    Weld County Deputy Bruce Sunada later submitted a written statement to the Weld County Jail regarding Ms. Kline's condition during the intake at Weld County jail at about 12:19 p.m.  His statement reads, in part, [Kline] was "lying on the bench face up… the vomit bag was almost full.  She  seemed to be super out of it. Even to the point that I did not think she was going to be able to be interviewed by the booking tech."

105.    In the body cam video, the Lochbuie Police Department Officer can be seen giving the Weld County Jail medical staff paperwork relating to Ms. Kline which included the medical paperwork from Platte Valley Medical Center and the written prescription for benzodiazepines to treat her ongoing alcohol withdrawal.

106.    The medical paperwork contained discharge materials from Platte Valley Hospital including the written and signed benzodiazepine prescription for Ms. Kline to ensure that she received at Weld County Jail the medication that was necessary for her to survive her ongoing alcohol withdrawals.

107.    Detective John Onderline of the Greeley Police Department was eventually assigned the task of investigating the death of Cassandra Kline.

19

108.   In the course of his investigation, Detective Onderline interviewed multiple witnesses, watched relevant law enforcement body cam video footage, and relevant video footage from cameras inside Weld County Jail, and reviewed written statements from the Individual Defendants.

109.   At the conclusion of his investigation, Detective Onderline drafted and signed a detailed Investigative Report which summarized his findings.

110.   With regard to Ms. Kline's initial medical check in the booking area at Weld County Jail, Detective Onderline reported that Ms. Kline "was already suffering from withdrawals but the Jail's contracted medical staff okayed her admission."

111.   During the initial medical check, Ms. Kline can be heard telling the intake nurse that there was no chance that she was pregnant; and Ms. Kline's non-pregnant status was written down by the intake nurse on the intake form.

112.

113.   Following the initial medical check, Ms. Kline was taken to a holding cell to await her medical screening with the Turn Key medical staff.

114.   At approximately 1:50 pm, Turn Key's medical staff at Weld County Jail charted the medical intake screening of Ms. Kline ("Intake Screening").

115.   Defendant Nurse Vera Thompson, a Registered Nurse for Turn Key, conducted the Intake Screening.

20

116. With regard to Ms. Kline's medical intake screening at Weld County Jail, Detective Onderline reported that Ms. Kline "conceded she'd certainly go through withdrawal while in jail and finished the interview lying on the office floor."

117. At the time of the medical intake screening, 1:50 p.m., Defendant Thompson was aware that Ms. Kline was already experiencing severe alcohol withdrawal symptoms and that she had been taken to t Platte Valley Medical Center's emergency department earlier that day by ambulance to be treated for alcohol withdrawal.

118. At the time of the medical intake screening, 1:50 p.m., Defendant Thompson was aware that a board-certified physician at Platte Valley Medical Center earlier that morning believed that Ms. Kline required benzodiazepines for her alcohol withdrawal and had written a prescription for them, a prescription that Defendant Thompson had in front of her when she conducted the medical intake.

119. Defendant Thompson, while performing an "Intake Assessment" and a "Drug and Alcohol Withdrawal Assessment" on June 24, 2023 at about 1:54 p.m., , stated the following in Ms. Kline's medical records:

a. Ms. Kline appeared disheveled;

b. Ms. Kline reported that she took 10-20 shots of vodka every day for the last fourteen (14) years;

c. Ms. Kline had her last drink at 5:00 am that morning (approximately nine (9) hours earlier);

21

d. Ms. Kline was currently having auditory hallucinations that were "[r]elated to alcohol withdrawal.";

e. Ms. Kline was "currently hearing voices or noises that others can't hear… [r]elated to alcohol withdrawal.";

f. Defendant Thompson observed that Ms. Kline was experiencing "TREMORS" with her arms extended.

g. Ms. Kline was experiencing "7 out of 7" "Constant nausea, frequent dry heaves and vomiting."

h. Ms. Kline was "seen at hospital for alcohol intoxication/withdrawal prior to booking."

i. Ms. Kline did not have mental health problems; and

j. Ms. Kline specifically reported that she was not pregnant and her last menstrual cycle was June 3, 2023.

120. The above symptoms, as described in the medical record by Defendant Thompson charted between 1:54 pm and 2:08 pm on June 24, 2023, made it plain and obvious that Ms. Kline was already experiencing severe symptoms of alcohol withdrawal and that she needed medications and medical treatment. Defendant Thompson specifically noted that "Withdrawal/Detox Monitoring" should be part of Ms. Kline's "Continuity of Care Plan."

121.    The intake sheet that Defendant Thompson filled out also instructed, relating to questions regarding alcohol use, that "IF ANY [ALCOHOL USE IS] DAILY – INITIATE APPROPRIATE DETOX/WITHDRAWAL MONITORING FLOWSHEET".

122.

123.    One of the primary purposes of initial medical screenings for new detainees in a county jail, such as Weld County Jail, is to detect people who may be at risk of withdrawal from alcohol once they are incarcerated so that they can be carefully monitored and medically treated.

124.    People who regularly abuse alcohol, such as Ms. Kline, become physically dependent upon it.

125.    When such individuals with alcohol dependency suddenly stop consuming alcohol, as occurs when they are arrested, they are at high risk of developing a withdrawal syndrome.

126.    Alcohol withdrawal syndrome is extremely dangerous and requires medical intervention to prevent progression of the withdrawal syndrome and potential death.

127.    Alcohol withdrawal syndrome, if left untreated, has a high risk of death.

128.    However, alcohol withdrawal syndrome follows a predictable stepwise progression and can be effectively prevented/treated with a class of drugs known as

benzodiazepines. Valium, Klonipin, Clonidine, and Ativan are examples of benzodiazepines

129. When a person who is physically dependent on alcohol stops drinking there are a multitude of severe health ramifications that can lead to death, and this was known to all of the Defendants here.

130. Because of these known risks, clinicians have developed the Clinical Institute Withdrawal Assessment for Alcohol (revised) or CIWA-Ar, which is often referred to as a CIWA scale or CIWA score. The CIWA-Ar assists a medical professional to measure the severity of the alcohol withdrawal syndrome and to gauge the effectiveness of medications being given to prevent or treat alcohol withdrawal symptoms.

131. At 2:08 pm on June 24, 2023, Defendant Thompson charted that she administered a CIWA-Ar assessment to Ms. Kline, to determine the severity of her known ongoing alcohol withdrawal.

132. Defendant Thompson charted that Ms. Kline scored a "16" on the CIWA-Ar assessment.

133. "16" is an extremely high CIWA-Ar score which, according to Defendant Turn Key's own policies that were in place at the Weld County Jail at that time, required Defendant Thompson to act "immediately" to ensure that Ms. Kline received benzodiazepines.

24

134. As noted above, at 7:20 a.m., earlier that day, while at Platte Valley Hospital, Ms. Kline's CIWA-Ar was scored by medical providers in her medical record at just "3" because, as Ms. Kline reported, her last drink was at about 5:00 a.m.

135. Between the time that she was evaluated at Platte Valley Hospital at 7:20 a.m. and when she was evaluated by Defendant Thompson at Weld County Jail at 1:50 p.m., Ms. Kline's symptoms of alcohol withdrawal significantly worsened as reflected by the increase of her CIWA-Ar score from "3" to "16."

136. By the time Ms. Kline was evaluated by Defendant Thompson at Weld County Jail, it had been about nine (9) hours since her last drink at 5:00 a.m. Ms. Kline's CIWA-Ar score was rapidly increasing that day because her alcohol withdrawal symptoms were rapidly worsening as more time passed since her last drink.

137. It was known to all Defendants that deadly alcohol withdrawal seizures can begin earlier than six (6) hours after a patient's last drink and that Ms. Kline was already within that dangerous window of time when she arrived at Weld County Jail that day.

138. When Defendant Thompson entered the CIWA-Ar score of "16" for Ms. Kline, the Turn Key electronic medical record ("EMR") automatically generated a prompt that appeared for Defendant Thompson on the screen of the EMR as follows.

| Appointment Created Date | 06-24-2023 2:08 pm |
|---|---|
| Appointment Description | Urgent Referral (CIWA on 2023-06-24): Calculated score CIWA = 16 |
| Appointment Category | HCP - Urgent Referral |
| Priority (1=High, 5=Low) | 1 |
| Current Status | Deleted |

139. This automatic EMR prompt was to reinforce for Defendant Thompson that because of the extremely high CIWA-Ar score of "16", Ms. Kline required an "Urgent Referral" to a Health Care Provider (*i.e.*- a physician or advanced practice nurse who can prescribe benzodiazepines) and that the priority for the urgent referral was of the highest possible priority (*i.e.*- 1 out of 5). As shown on the EMR above, the "Urgent Referral" was "Deleted."

140. Defendant Turn Key's written policy for Alcohol Withdrawal for its nurses at the Weld County Jail in June of 2023 stated, in part:

WITHDRAWAL MONITORING BASICS
- WE IDENTIFY INMATES WHO MAY GO THROUGH WITHDRAWALS IN BOOKING.
- ALL INMATES WHO WILL POTENTIALLY GO THROUGH WITHDRAWALS IN THE FACILITY ARE PLACED ON DETOX CHECKS.
- WE DO NOT PLACE INMATES ON DETOX CHECKS FOR METHAMPHEDAMINES OR MARIJUANA
- IF THEIR INITIAL DETOX SCORE IS HIGH ENOUGH IN BOOKING A PROVIDER IS TO BE CALLED SO THAT MEDICATIONS CAN BE STARTED IMMEDIATELY

141. Defendant Turn Key's written policy for Alcohol Withdrawal for its nurses at the Weld County Jail in June of 2023 also stated, in part:

26

**ALCOHOL AND BENZOS - CIWA**
- SCORES 8< LEVEL 1 MEDICATIONS MUST BE STARTED
- SCORES 13< LEVEL 2 MEDICATIONS MUST BE STARTED
- INMATES EXPERIENCES SEVERE WITHDRAWAL SYMPTOMS MUST HAVE A PROVIDE NOTIFIED IMMEDIATELY (HALLUCINATIONS, UNABLE TO WALK OR STAND W/O ASSISTANCE, UNABLE TO HOLD DOWN FOOD OR WATER, ETC)

**ALCOHOL AND BENZO LEVEL 2 MEDICATION**
- KLONIPIN TAPER

142. Accordingly, as per Defendant Turn Key's own written policy, for a patient like Ms. Kline, whose detox CIWA-Ar score of "16" was greater than "13", "Level 2 Medications" (*i.e.*, the benzodiazepine Klonipin Taper) "must be started."

143. As per Defendant Turn Key's own written policy, "If their initial detox score is high enough in booking [*i.e.*- a CIWA-Ar score of 13 or higher] a Provider is to be called so that medications can be started immediately."

144. As used in the Turn Key policy above, "Provider" means a health care provider who is licensed and permitted to prescribe medications for patients (*i.e.*- a physician or an advanced practice nurse). A registered nurse, like Defendant Thompson, is not permitted or licensed to prescribe medications.

145. Defendant Turn Key, to save costs and increase its own profits, failed to hire and pay for an onsite "Provider" (*i.e.*- a physician or an advanced practice nurse) to be present at the Weld County Jail on June 24, 2023. As a result, Defendant Thompson was required to contact an off-site remote Turn Key advanced practice

27

nurse located in Alabama (Defendant Starr Graham) to obtain prescriptions for all patients at Weld County Jail, including Ms. Kline.

146. As per the Turn Key policy cited above, when "Inmates [who] experience severe withdrawal symptoms must have a provider notified immediately. (Hallucinations, Unable to walk or stand w/o assistance, Unable to hold down food or water, etc.)"

147. By 2:08 p.m., Defendant Thompson knew and charted that Ms. Kline was presently experiencing all three of the different "severe withdrawal symptoms" above that required that a Provider be notified "immediately." Specifically, Defendant Thompson charted that due to her alcohol withdrawal Ms. Kline was experiencing "hallucinations", "Constant nausea, frequent dry heaves and vomiting", and she wrote that Ms. Kline had to complete the medical intake while lying flat on the floor (*i.e.-* could not stand without assistance).

148. Turn Key policy required that even just one of these three specific "severe withdrawal symptoms" required that Defendant Thompson notify a Provider "immediately", and Ms. Kline was exhibiting all three symptoms during her medical intake.

149. Ms. Kline's CIWA-Ar score of 16 required Defendant Thompson to act without delay consistent with the Turn Key policy that "a Provider is to be called so that medications can be started immediately."

28

150.    Rather than notifying a "Provider" "immediately" at 1:50 p.m. about Ms. Kline's severe alcohol withdrawal symptoms (as was required by Turn Key's above policy so that benzodiazepines could be prescribed) Defendant Thompson delayed until approximately 6:00 p.m. to notify a "Provider" about Ms. Kline's condition.

151.    Defendant Thompson was a gatekeeper for Ms. Kline because Ms. Kline could not receive the benzodiazepines that she needed unless and until Defendant Thompson took action for that to occur.

152.    The four-hour delay in Defendant Thompson's notification of the "Provider", in contravention of both the Turn Key policy and Defendant Thompson's knowledge that a delay in treatment for alcohol withdrawal can cause death, constituted deliberate indifference to the health and safety of Ms. Kline.

153.    Furthermore, as described below, Defendant Thompson left the Jail at 6:00 p.m. without ensuring that Ms. Kline received the benzodiazepines that had been belatedly ordered for her, and as a result, Ms. Kline never received the benzodiazepines, which was a cause of her death.  This also constituted deliberate indifference by Defendant Thompson to the health and safety of Ms. Kline.

154.    Defendant Thompson, and the other Individual Medical Defendants, knew that if Ms. Kline did not receive timely medical interventions, including withdrawal medications, she was at high risk of dying from alcohol withdrawal syndrome.

29

155. All of the Individual Defendants knew that, given Ms. Kline's known severe alcohol withdrawal, she also required consistent monitoring to ensure that her symptoms did not turn deadly.

156. Defendant Thompson, acting in a manner that was deliberately indifferent to the welfare of Ms. Kline, did not provide Ms. Kline with any medical interventions, including withdrawal medications, for the remainder of Defendant Thompson's shift which ended at 6:00 p.m. that day.

157. By 1:56 p.m., Defendant Thompson had entered the alcohol withdrawal symptom information into Ms. Kline's Turn Key medical record described above (including that Ms. Kline was already hallucinating) which would make any jail medical provider aware that Ms. Kline required immediate medical interventions, including withdrawal medications in order to keep her safe.

158. The Defendant Turn Key employees/agents Thompson, Mast, Flores and Graham all had access to Ms. Kline's Turn Key medical record, and the Platte Valley Hospital discharge paperwork, and all had a duty to understand that their patient Ms. Kline required immediate medical interventions, including withdrawal medications in order to keep her safe.

159. As shown in the Turn Key medical record, at 5:56 p.m., shortly before the end of her shift at 6:00 p.m., Defendant Thompson finally requested an Order from a "Provider" for the life-saving medications (benzodiazepines) that Ms. Kline needed when she first arrived at the jail at about 12:12 p.m.

30

160. Benzodiazepine medications had been previously prescribed to Ms. Kline by Platte Valley Hospital staff approximately eight (8) hours earlier, which, Defendant Thompson and all Defendants here were aware of because of the discharge paperwork placed in Ms. Kline's file.

161.

162. At about 5:56 p.m., Defendant Starr Graham, a licensed nurse practitioner, entered the Order in  Ms. Kline's medical record that Ms. Kline be provided with the life-saving medications (benzodiazepines) that Ms. Kline needed when she first arrived at the jail at about 12:12 p.m.

163. At 6:00 p.m., Defendants Nurse Kristina Mast and Nurse Brittani Flores, who were also Turn Key employees, began their shifts at the Weld County Jail while Defendant Thompson ended her shift.

164. At that time, 6:00 p.m., Defendant Thompson provided a "hand off report" regarding Ms. Kline only to Defendant Nurse Mast (the incoming booking nurse) and told Defendant Thompson that Ms. Kline had not yet received her benzodiazepines.

165. As per Detective Onderline's report, Defendant Thompson "passed on to the incoming Booking Nurse, RN Kristina Mast, Cassandra's care plan before leaving for the day."

166. However, Defendant Mast testified during her May 7, 2026 deposition in this case that she (Defendant Mast) was not at all responsible for Ms. Kline that

31

day and that Defendant Thompson performed the "hand off report" to the wrong nurse.

167. According to Defendant Mast, Defendant Nurse Brittani Flores was the incoming nurse who was responsible for Ms. Kline, and Defendant Thompson should have performed her "hand off report" to Defendant Flores and should have informed Defendant Flores that Ms. Kline had not yet received her benzodiazepines.

168. Thus, in addition to all of Defendant Thompson's deliberate indifference towards Ms. Kline's health and safety that is discussed above, Defendant Thompson also failed to inform and alert the correct incoming nurse (Defendant Flores) that Ms. Kline had still not received the benzodiazepines that she needed.

169. As explained by Defendant Mast, Defendant Flores was providing the "Med Pass" medication administration to the inmates that evening which meant that Ms. Kline was Defendant Flores' responsibility as of 6:00 p.m.

170. Indeed, at some point after 6:00 p.m., Defendant Flores is seen on the Jail's internal security video wheeling a medication cart containing benzodiazepines directly past the cell where Ms. Kline was dying from alcohol withdrawal without stopping to provide the ordered medications.

171. Defendant Flores failed to conduct the required "hand off report" with Defendant Thompson when Defendant Flores began her shift at 6:00 p.m.

172. If at 6:00 p.m., Defendant Flores had conducted the required "hand off report" with Defendant Thompson, or if Defendant Flores had simply looked at Ms.

Kline's medical record, Defendant Flores would have kwon that Ms. Kline had still never received the benzodiazepine medications that had been ordered for her first at 9:00 a.m. at Platte Valley Medica Center and then again at 5:56 p.m. by Defendant Graham.

173.    Defendant Mast, who was made aware at 6:00 p.m. by Defendant Thompson that Ms. Kline had still never received the benzodiazepines, failed to tell Defendant Thompson that she (Defendant Mast) was the wrong nurse to be provided this information and Defendant Mast also failed to herself communicate this information to the correct nurse (Defendant Flores).

174.    Despite the fact that an Order had been entered into Ms. Kline's medical record at 5:56 p.m. that Ms. Kline required life-saving medications (benzodiazepines), Defendant Mast and Defendant Flores never provided any of the ordered medications to Ms. Kline.

175.    As per the Turn Key medical record, and as shown on the Jail internal security video, Defendant Mast and Defendant Flores did not provide any observation, evaluation, or treatment whatsoever for Ms. Kline before she died from alcohol withdrawal seizures at about 7:50 p.m.

176.    Defendant Starr Graham, as the medical provider who had ordered the life-saving medications (benzodiazepines), had a duty and obligation to ensure that Ms. Kline did in fact receive the medications.

33

177.    Defendant Starr Graham had full access to the Turn Key medical record and was aware that Ms. Kline never received the life-saving medications (benzodiazepines) that Nurse Starr had ordered at 5:56 p.m.  Defendant Graham failed in her duty to supervise Defendants Thompson, Flores, and Mast and ensure that the benzodiazepines were provided to Ms. Kline.

178.    In addition to the benzodiazepine Clonazepam, at 5:56 pm, the following necessary and standard medications were also ordered to treat Ms. Kline's progressing alcohol withdrawal symptoms: (a) Ondansetron and Omeprazole, for nausea and vomiting; (b) Methocarbamol, for muscle contractions; (c) Loperamide, for diarrhea; (d) Electrolyte Solution and Ensure Liquid, for hydration and nutrition; and (3) Vitamin B-1, for thiamine deficiency.

179.    However, none of the medications that were ordered for Ms. Kline at 5:56 pm were ever administered to her.

180.    Defendants Mast, Flores, and Graham were gatekeepers in that these were the only three individuals who could provide Ms. Kline with the needed medications from 6:00 p.m. onward.

181.    The Individual Medical Defendants chose not to administer any withdrawal medications at all to treat Ms. Kline's life-threatening alcohol withdrawal syndrome, despite their knowledge that this was necessary for Ms. Kline's health and safety and had been ordered by multiple internal and external medical care providers.

*The "Turmoil" with the Weld County Jail Medical Staff in June of 2023*

182. On June 15, 2023, nine days before Ms. Kline's death, Turn Key provided written notification to Weld County that Turn Key was terminating its contract to provide the medical services at the Weld County Jail.

183. The reason that Weld County Jail terminated its contract with Weld County on June 15, 2023 was that Turn Key felt that Weld County was blaming Turn Key for the death of a different female inmate (Amy Cross) which had led to the filing of a federal lawsuit against Turn Key and Weld County very similar to this one and which is discussed in more detail below.

184. As part of the June 15, 2023 contract termination, Turn Key agreed that it would continue to provide the medical services at the Weld County Jail for 90 days (until September 14, 2023) while Weld County looked for a new medical services contractor to replace Turn Key.

185. However, once the termination notice was provided by Turn Key on June 15, 2023, the medical services provided by Turn Key at Weld County Jail quickly deteriorated.

186. Defendant Nurse Mast testified during her May 7, 2026 deposition that once Turn Key terminated its contract on June 15, 2023, the medical services at the Weld County Jail descended into "turmoil" and "There was just a lot of instability that I observed."

187. Defendant Mast testified as follows regarding Turn Key's head administrator at the Weld County Jail (Felicia Kelly) during the post-termination

35

time frame: "I don't think she was invested in her team and the transition. I think she was just trying to figure out how to tread those waters. They were unknown to her."

188.    Defendant Mast then resigned from her job with Turn Key in August 2023 as "a form of protest" "to the situation at the Weld County Jail."

189.    Defendant Mast testified she resigned from Turn Key in August 2023 "to open the eyes of [Felicia Kelly] to the situation at the Weld County Jail" and "hoped that it would help the nurses and even the patients who were still there after [she] resigned her position."

190.    As per its own internal documents, Turn Key and its nurses at the Weld County Jail were aware prior to Ms. Kline's death on June 24, 2023 that "Too many [inmate medications were] getting missed and inmates going without meds.", in other words, too many inmate patients were not receiving their medications from the nurses.

191.    Just a few weeks before Ms. Kline's death, Weld County Jail Turn Key administrator Felicia Kelly circulated an internal memo to the Turn Key nurses that stated, in part:

> Med verifications MUST be done ASAP after the medical intake. Preferably in intake but if you are slammed just make sure they get done asap, ask for help! Too many getting missed and inmates going without meds. Erin is willing to help out with

### *The Weld County Deputy Defendants Bowers and Hawkins*

36

192.    Individual Deputy Defendants Bowers and Deputy Hawkins were the swing shift booking deputies at Weld County Jail during the time that Ms. Kline was incarcerated there and they were responsible for the custody, care, and supervision of incarcerated individuals, including Ms. Kline.

193.    Defendants Bowers and Hawkins began their work shift at Weld County Jail on June 24, 2023 at 1:00 p.m.

194.    Defendants Bowers and Hawkins, were aware at the time that they began their shift that Ms. Kline was experiencing alcohol withdrawal and had been placed on Detox/Withdrawal monitoring.

195.    Deputy Bowers confirmed this during his videotaped interview with Detective Onderline, who wrote into his Investigative Report, "Deputy Bowers had pass on information from the dayshift deputies that Kline was having alcohol withdrawals based on a medical screening completed."

196.    Deputy Hawkins confirmed this during his videotaped interview with Detective Onderline, who wrote into his Investigative Report, "When he [Hawkins] took over, one of the deputies told him Cassandra was suffering from alcohol withdrawals."

197.    Deputies Hawkins and Bowers both understood that alcohol withdrawal can be deadly if not promptly treated.

198.   At 6:42 pm, another inmate in the cell with Ms. Kline (Ms. Barbara Guzman) began pounding on the cell door to summon help for Ms. Kline because Ms. Kline was having an alcohol withdrawal seizure and breathing problems.

199.   At that time, Defendant Deputy Bowers walked over to the cell and Ms. Guzman told Defendant Deputy Bowers through the cell door that Ms. Kline was having seizures, breathing oddly like an asthma attack, was writhing, stiff, and laying halfway off her bunk (*i.e.* having alcohol withdrawal induced seizures).

200.   Defendant Deputy Bowers disregarded Ms. Guzman's plea for help for Ms. Kline, saying, "That's normal," and did not open the cell to check on Ms. Kline, and walked away despite his knowledge that she was experiencing severe alcohol withdrawal.

201.   The subsequent death investigation by the Greeley Police Department determined that "At 6:42 p.m., Inmate Barbara Guzman alerted [Defendant Deputy] Bowers to Cassandra's seizures.  She was writhing, stiff, breathing oddly, and laying halfway off the bunk.  According to Barbara, [Defendant Deputy] Bowers blew her off."

202.   Detective Chris Onderline, the Greeley Police Department Detective who led the subsequent death investigation, testified during his May 12, 2026 deposition in this case, that with regard to Ms. Kline, Defendants Deputies Bowers and Hawkins were "disinterested", "lazy", "insufficient" and showed "negligence."

203.    Deputy Defendants Bowers and Hawkins were both disciplined in writing by Weld County Sheriff's Office for their roles in Ms. Kline's death.

204.    In the minutes after Ms. Kline was found dead at about 8:00 p.m., Weld County Deputies interviewed her cellmate Ms. Guzman, while their body cam videos recorded the interview.  Ms. Guzman is recorded on the body cam videos stating that she told Defendant Deputy Bowers that Ms. Kline was having a seizure when they spoke through the cell door [at 6:42 p.m.].

205.    The subsequent death investigation by the Greeley Police Department also determined that "Barbara's consistent statements to deputies and a CIRT investigator seemed to substantiate her claim."

206.    Weld County Deputy Zachary Reeves submitted a written statement to the Weld County Jail regarding his interview of Ms. Guzman in the minutes following Ms. Kline's death.  His statement reads, in part, "[Barbara Guzman] told me that she noticed [Kline's] hands and fingers cramp up, fingers curled up and she started shaking like she was having a seizure, then [Guzman] said it seemed like [Kline] was having an asthma attack by the way she was breathing.  [Guzman] started banging on the door to get a deputy over there."

207.    Deputy Bowers and Deputy Hawkins were required by Weld County Jail policy to check on Ms. Kline at least every fifteen (15) minutes.  The policy states:

39

## Inmate Safety Checks

### 504.1  PURPOSE AND SCOPE
The purpose of this policy is to establish a requirement for conducting visual safety checks by completing a walkthrough of all inmate occupied areas at least once every 15 minutes.

### 504.2  POLICY
It is the policy of the Weld County Sheriff's Office that all correctional staff shall conduct safety checks at least once every 15 minutes on all inmates, or more frequently as determined by inmate custody status and/or housing classification.

Safety checks shall be made through direct visual observation. Cameras and monitors may

(d)    Safety checks shall be done by personal observation of the deputy and shall be sufficient to determine whether the inmate is experiencing any stress or trauma.

208.    As stated by Detective Onderline in his report, "Swing shift Booking deputies checked on, or interacted with, Cell 7 [where Ms. Kline was held] about 24 times over six hours (1:27PM-7:45PM). The majority of those checks (13) were done after 20-30 minutes with the longest gap being more than an hour. When the checks did occur, many were apathetic; lackadaisical at best."

209.

210.    With regard to Deputy Hawkins, Detective Onderline stated in his report, "I asked how Cassandra generally appeared and behaved during their interactions. He [Hawkins] said she seemed like she was, in fact, withdrawing. He knew she was vomiting throughout the afternoon."

211.    Deputy Bowers and Deputy Hawkins acted in a deliberately indifferent manner towards Ms. Kline's known life threatening condition because they: (1) Knew as of 1:00 p.m. that she was exhibiting dangerous symptoms of life threatening alcohol withdrawal; (2) Ignored her worsening symptoms of alcohol withdrawal from

40

1:00 p.m. until her death at about 7:45 p.m.; (3) Failed to check on Ms. Kline in fifteen (15) minute increments as is required by jail policy and went more than an hour at times without checking on Ms. Kline; and (4) Disregarded the concerns of Ms. Kline's cell mate at 6:42 p.m.

212.    Nor did the Individual Medical defendants or the Individual Deputy Defendants regularly monitor Ms. Kline's symptoms to ensure that her withdrawal did not turn deadly.

213.    There is no record that any of the Individual Defendants called for additional or emergency medical services for Ms. Kline while she was alive, despite their knowledge that she was suffering from alcohol withdrawal.

214.    Instead, Ms. Kline was left to deteriorate in her holding cell, and predictably, she was found dead approximately six hours after her Assessment.

215.    At about 7:50 p.m., Deputy Defendant Hawkinsfound Ms. Kline unresponsive in her cell and called a "Medical Code 5."

216.    A Medical Code 5 is a declaration of a medical emergency and the most emergent medical code the staff can call. It is called when staff determine that an inmate requires immediate medical attention – it prompts all available nursing and security staff to respond to that inmate's location.

217.    Around 7:50 pm, the Individual Medical Defendants, responded to the medical emergency and arrived at Ms. Kline's cell.

218.    Defendant Mast noted that Ms. Kline did not have a heartbeat or pulse.

41

219.    Emergency medical services were called and arrived at 7:57 pm.

220.    Emergency medical services then moved Ms. Kline out of her cell and initiated advanced cardiopulmonary resuscitation (CPR) which was unsuccessful.

221.    Ms. Kline was declared dead at 8:16 pm, approximately seven hours after she was booked at Weld County Jail.

222.    There is no record of any Defendant monitoring, evaluating, or reassessing Ms. Kline at any time after 2:08 pm, until she was found dead nearly six hours later.

223.    None of the Individual Medical Defendants monitored, evaluated, or re-assessed Ms. Kline at any time after 2:08 pm, until she was found dead nearly six hours later.

224.    The "Medication Administration Record" in Ms. Kline's medical records from the Weld County Jail shows "[blank]" or "absent" for every single anti-withdrawal and other medication that was ordered for Ms. Kline at 5:56 pm, indicating that Defendants never administered any of the necessary medication to Ms. Kline.

225.    The Individual Medical Defendants knew that Ms. Kline was suffering from severe alcohol withdrawal that could result in her death, and they knew that she required medication to treat such potentially deadly withdrawal, yet they decided to not administer such necessary medication.

226. The Individual Medical Defendants and the Individual Deputy Defendants knew that Ms. Kline was suffering from severe alcohol withdrawal that could result in her death, and they knew that she required consistent and repeated monitoring and re-assessment, yet, on information and belief, none of the Individual Defendants monitored, evaluated or assessed Ms. Kline after 2:08 pm.

227. On June 26, 2023, an autopsy was conducted on Ms. Kline's body, and the Weld County Coroner's office reached the following conclusion, "Based on the history provided and the autopsy findings, the likely cause of death is an ethanol withdrawal related seizure."

228. The Individual Deputy Defendants had a duty to not disregard Ms. Kline's known serious medical needs, arising from her ongoing and severe alcohol withdrawal.

229. The Individual Deputy Defendants acted with deliberate indifference towards Ms. Kline's serious medical needs.

### Weld County Failed to Train its Deputies on Alcohol Withdrawal

230. Weld County and the Weld County Sherriff's Office had a duty to train and assess the competency of its deputies who worked at the Weld County Jail, including Defendant Deputies Hawkins and Bowers, to recognize the signs and symptoms of alcohol withdrawal.

231. Both Defendant Deputies Hawkins and Bowers testified during their depositions in this case that they never received any training or competency

43

assessments at all from Weld County Sheriff's Office (or from anyone else) on alcohol withdrawal and recognizing its signs and symptoms.

232.    Both Defendant Deputies Hawkins and Bowers testified during their depositions in this case that in June of 2023, they did not understand the difference between someone who had a "hangover" and someone who was undergoing alcohol withdrawal.

233.    The deputies who worked at the Weld County Jail, including Defendant Deputies Hawkins and Bowers, needed to be trained to recognize the signs and symptoms of alcohol withdrawal so that they could notify the Jail's medical providers if an inmate, like Ms. Kline, was exhibiting concerning symptoms of alcohol withdrawal so that medical treatment could be provided.

234.    The Weld County Jail Deputies are well positioned to identify inmates who are exhibiting concerning symptoms of alcohol withdrawal because they are required by Jail policy to conduct visual safety checks upon the inmates at least every fifteen minutes.

235.    The critical importance of Weld County's duty to train and assess the competency of its deputies in this regard is reflected and reinforced by Weld County Jail's written policies and procedures that were produced in this case.

236.    Policy 502.6.1 of the Weld County Sherriff's Office Detention Policy and Procedure Manual states: "502.6.1 MONITORING FOR SIGNS OF INTOXICATION AND WITHDRAWAL Staff shall respond promptly to medical symptoms presented

44

by inmates to lessen the risk of a life threatening medical emergency and to promote the safety and security of all persons in the facility.  Custody staff should remain alert to signs of drug and alcohol overdose and withdrawal, which include, but are not limited to, sweating, nausea, abdominal cramps, anxiety, agitation, tremors, hallucinations, rapid breathing and generalized aches and pains. Any staff member who suspects that an inmate may be suffering from overdose or experiencing withdrawal symptoms shall promptly notify appropriate medical staff and the supervisor."

237.    Policy WCDC-C-04, also produced in this case, entitled "Health Training for Correctional Officers" states in pertinent part: "Correctional Officers who work with inmates receive health-related training at least every two (2) years.  This training includes, at a minimum: Recognizing acute manifestations of certain chronic illnesses, (e.g. asthma, seizures), intoxication and withdrawal… An outline of the training course is kept on file.  A certificate or other evidence of attendance is kept on sire for each employee.

238.    Despite its own written policies which required that its jail deputies be trained in recognizing the signs and symptoms of alcohol withdrawal, Weld County failed to do this.

239.    As a result, on June 24, 2023, Defendant Deputies Bowers and Hawkins did not recognize the concerning and obvious signs and symptoms of alcohol withdrawal that Ms. Kline was exhibiting and this was one cause of her death.

***Additional Allegations Relating to <u>Monell</u> Liability***

240.  Health care contractor Turn Key serves nearly 70 counties across Oklahoma, Texas, Arkansas, Louisiana, Colorado, Kansas, and Montana.

241.  At all relevant times, the County Defendants contracted with Turn Key to provide medical care and services to detainees and inmates at Weld County Jail.

242.  Turn Key maintained constitutionally deficient policies at the Weld County Jail and failed to adequately train and supervise their employees with respect to proper procedures for the evaluation and treatment of inmates' serious medical needs.

243.  Treating the symptoms of alcohol withdrawal is a common and recurring need in all jails, including the jails (like the Weld County Jail) in which Turn Key provides the medical care for the inmates.

244.  Evaluating and treating the needs of inmates with symptoms of alcohol withdrawal is a usual and recurring task for health care workers in the Weld County Jail.

245.  The Individual Defendants disregarded Ms. Kline's symptoms which were obvious signs of alcohol withdrawal, including nausea, dry heaves, anxiety, sweats, tremors, and auditory and visual disturbances.

246.  Though Ms. Kline scored a 16 on the CIWA-Ar Assessment, the "high to moderate" risk category, Individual Defendants continued to follow their deliberately indifferent plan of refusing to provide treatment or sending Ms. Kline to an outside

46

provider for care. They did this pursuant to Turn Key's custom of disregarding objective symptoms and subjective complaints.

247.    Each of the Individual Defendants violated Ms. Kline's constitutional right to be free from deliberate indifference to her medical needs in essentially the same unconstitutional manner – failing to treat her significant medical problems and ignoring life-threatening symptoms, despite knowing that failing to do so put her at significant risk of serious illness or death.

248.    Upon information and belief, Individual Defendants were not disciplined as a result of Ms. Kline's death. This pattern, including all Defendants following the same unconstitutional plan to not provide medical care to Ms. Kline, and the express toleration by Turn Key of the same, evinces the Turn Key's custom, policy, or practice of deliberate indifference.

249.    As a for-profit medical provider, Turn Key maintains a custom, practice, and policy of disregarding and minimizing inmates' medical complaints, failing to order diagnostic testing, failing to timely send patients to the hospital to save money and increase profits, understaffing, and using nurses to practice medicine recklessly outside their scope.

250.    Upon information and belief, at all relevant times, Turn Key had only four doctors, three psychiatrists and 10 nurse practitioners on its' entire staff, which oversaw care at multiple jails in different states.

47

251.    Upon information and belief, in many of their contracts, Turn Key agrees to cover all costs, up to a limit, for inmates who require diagnostic testing or outside medical services, including hospitalization and specialized treatment for serious illnesses and medical emergencies.

252.    In its bid for the Weld County contract, Turn Key made absolutely clear that a core tenet of their business and pricing model is to reduce costs, and increase their profits, by reducing "unwarranted" offsite costs:

> Turn Key has concrete evidence of how our simplistic approach has dramatically reduced unwarranted offsite costs, specifically at facilities that were previously managed by Armor. According to statistics maintained by the facility, **Tulsa County experienced a 77% reduction in monthly Emergency Room transfers and a 35% reduction in monthly hospitals days** within the first few months of Turn Key replacing Armor's program. To further highlight our success, **the annual offsite expenditures have remained well below the established Aggregate CAP since we started our contract. This is an accomplishment that had not been realized for at least 4 years prior to Turn Key taking over the program!**
>
> In addition to the cost savings associated with fewer hospital claims, Tulsa County experienced additional cost savings in the form of the reduced need for offsite security personnel. On average, TCSO was able to reallocate an average of 585 man-hours per month to other security functions as opposed to ER and hospitalization security duty. Even with a conservative estimate, **we believe our program allowed for an annual reduction of more than $175,000.00 of excessive offsite security pay.**

253.    Upon information and belief, in its $4.5 million dollar contract with Weld County, Turn Key agreed to cover only $125,000 in offsite and specialty care costs per year, despite understanding there would be, on average, more than 800 detainees in their care.

254.    Upon information and belief, at the time Turn Key bid on the Weld County contract, the jail had 959 beds and was in the process of constructing a new

wing, to be completed by the end of 2020. The new wing allowed for 381 additional beds – bringing the Jail's capacity to 1,340 and making Weld County Jail Turn Key's third largest facility.

255.    Accordingly, Turn Key had a strong financial incentive not to send seriously ill patients to an outside health care provider.

256.    Prior to Ms. Kline's death, there was a well-known widespread pattern and practice of deliberately indifferent medical care at Turn Key facilities, including Weld County Jail.

257.    Turn Key's custom, policy or practice of deliberate indifference regarding assessing and treating serious medical needs is further evidence of deaths and serious injuries in their jails revealed through the many related lawsuits.

258.    Because Turn Key is a large company with a reprehensible record of providing constitutionally inadequate medical care at institutions across the Oklahoma-Arkansas region, there are a plethora of examples from other facilities demonstrating Turn Key's culture, custom, policy, and practice of deliberate indifference to the serious medical needs of their prisoner-patients. In the four years preceding the Weld County contract award, Turn Key was named as a defendant in at least fifty lawsuits alleging inadequate medical care in Oklahoma and Arkansas alone.

259.    When Turn Key contracted to provide medical services at the Weld County Jail in December 2019, the company had already been named as a defendant

in at least a hundred lawsuits alleging they provided inadequate medical care to inmates.

260.   Upon information and belief, in 2009, Lacee Danielle Marez was booked into the Cleveland County Jail for missing a court appearance. During a tussle with jail staff Ms. Marez, only 21 years old, struck her head on a concrete floor and suffered a traumatic brain injury. Over the next several days Ms. Marez repeatedly asked for medical treatment, began vomiting, urinating on herself, and laying lethargic in her bed. ESW Correctional Healthcare (a previous iteration of Turn Key Health Clinics, LLC) staff ignored Ms. Marez's requests for medical attention and obviously serious symptoms. Medical staff abandoned Ms. Marez in a holding cell for three days, where she slipped into a coma and suffered a heart attack. Ms. Marez lived in a vegetative state for several years but eventually passed away. In 2014, Turn Key paid a confidential amount to settle a federal civil rights lawsuit related to this incident.

261.   Upon information and belief, while detained at the Cleveland County Detention Center in November of 2014, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key medical staff that a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain infections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided. Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to

provide written consent for Mr. Autry to receive emergency surgery. He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a result of an untreated sinus infection," and underwent emergency brain surgery. Mr. Autry underwent a series of other procedures to place a feeding tube, insert a tracheal tube, and replace a cranial monitoring probe. Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

262.    Upon information and belief, in June 2016, Turn Key medical staff at Garfield County, Oklahoma Jail did nothing to intervene while Anthony Huff, who was experiencing delusions and hallucinations, was kept in a restraint chair for more than 55 hours. Mr. Huff was ultimately found unresponsive in the chair and pronounced dead. After a federal wrongful death lawsuit was filed on Mr. Huff's behalf, two Turn Key nurses and various jail staff were each charged with felony second-degree manslaughter. In October 2019, Garfield County paid $12.5 million to settle the case, to which Turn Key contributed a confidential amount.

263.    Upon information and belief, Anthony Kade Davis also died in June 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. In the days leading up to his death Mr. Davis was screaming, shouting

51

that he was in pain, and pleading for assistance. He was known to be ill and experiencing serious and dangerous symptoms including black, foul-smelling feces that had the appearance of coffee grounds. Despite knowing of these serious symptoms, Turn Key medical staff did not assess Mr. Davis or perform any diagnostic tests to determine the cause. A federal civil rights lawsuit arising from Mr. Davis's death was filed in 2017.

264. Upon information and belief, Michael Edwin Smith became permanently paralyzed in the Muskogee County Jail in the summer of 2016 when Turn Key staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Mr. Smith had cancer, which spread to his spine, causing a dangerous spinal compression – a condition that can cause permanent paralysis if untreated. When he told the Turn Key-employed physician at the jail that he was paralyzed, the doctor laughed at Mr. Smith and told him he was faking. For a week before he was able to bond out of the jail, Mr. Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He lay in his own urine and feces because the jail staff accused Mr. Smith of faking paralysis and refused to help him. Turn Key settled a lawsuit arising from the incident in 2018.

265. Upon information and belief, on August 28, 2016, Andrew Bowen arrived at the Greene County Jail having been severely beaten by the arresting Greene County Sheriff's Deputy. He was bleeding from the head, unconscious, and

52

exhibiting agonal breathing/loud snoring – a clear indicator of severe head and brain injury. While jail staff laughed at Mr. Bowen, a Turn Key nurse attempted to awaken Mr. Bowen without success. Despite recognizing that Mr. Bowen needed emergency medical care, and that she was not equipped with the necessary equipment to assist Mr. Bowen in this medical emergency, the nurse did not provide any timely assessment or treatment, or arrange for Mr. Bowen's transfer. Rather, no ambulance was called until after jail employees cleaned the blood off him, changed him out of his blood-soaked clothes, and booked him into the jail. When he finally arrived at the hospital Mr. Bowen had a large hematoma on his forehead and a gaping laceration on his chin. He was unconscious, experiencing seizures, and had to be intubated due to respiratory failure. After a month in the hospital Mr. Bowen was released to a step-down facility, but never fully recovered from the severe brain injury and the delay in treatment he suffered. Turn Key settled a federal civil rights lawsuit arising from the incident in April 2019.

266. Upon information and belief, Russell Ted Foutch died September 30, 2016, after staff at the Creek County Jail observed him foaming at the mouth and coughing up blood. Before his death, Mr. Foutch complained of shortness of breath, lost consciousness multiple times in front of jail staff, and reported coughing up blood. Other inmates and Mr. Foutch's family noticed that he was ill and asked that he receive treatment. Mr. Foutch laid in his cell and slowly died from complications

53

related to pneumonia without ever receiving the medically appropriate treatment and care he so desperately and obviously needed to save his life.

267. Upon information and belief, when James Buchanan was booked into the Muskogee County Jail in November 2016, he informed staff that he had been in a car accident and was suffering from broken ribs, a collapsed lung, and neck problems. He was nonetheless placed in a general population pod where, over the course of the next ten days, Mr. Buchanan became quadriplegic one limb at a time because a cervical epidural abscess was allowed to fester. Turn Key medical staff were aware that Mr. Buchanan was experiencing sudden and expanding paralysis but did nothing, even after he lost the ability to feed and hydrate himself. Rather they looked on as other inmates helped Mr. Buchanan eat, drink, and use the toilet, and scheduled him for a visit with the doctor the following week. It was only when Mr. Buchanan was found lying in a puddle of his own urine, complaining of 10/10 pain nearly 11 days after the initial onset of his symptoms that he was finally sent to the hospital. Mr. Buchanan remained paralyzed and permanently disabled despite spinal surgery.

268. Upon information and belief, on December 14, 2016, 41-year-old Sharon Lavette Alexander of Little Rock, Arkansas, died at Pulaski County Jail. She had been booked into custody the day before her death. When she was processed into the jail, her asthma inhaler was taken from her and not returned. An autopsy revealed acute exacerbation of asthma was the cause of her death. A federal wrongful death

54

lawsuit was filed by Alexander's family in January 2018. In May 2019 the case settled for $425,000 – Pulaski County paid $50,000 and Turn Key paid $375,000 to the family.

269.    Upon information and belief, on February 15, 2017, Trillus Smith died in the Pulaski County Regional Detention Facility from acute pneumonia and dehydration. In the two weeks preceding her death, Turn Key medical staff observed that Ms. Smith was becoming less oriented to reality, unable to communicate, lethargic, not eating or drinking, and that her eyes were rolling in her head. Several nurses collected dangerously abnormal vital signs including critically low blood pressures on February 13th and 14th. Ms. Smith's blood labs also indicated a life-threatening condition. Despite these critically abnormal vital signs and values, Ms. Smith was never assessed by a higher-level caregiver or transported to the hospital. Rather, she was left alone in her cell to die.

270.    Upon information and belief, on June 10, 2017, Ronald Garland was brought to the Creek County Detention Center, a Turn Key facility, on charges of driving under the influence. No intake medical screening was performed and Mr. Garland was placed in a housing unit. More than 12 hours later a nurse noted that a jail staff member alerted her Mr. Garland was "acting weird" in the housing unit. She assessed Mr. Garland shortly thereafter and noted he denied being under the influence of any drugs or alcohol, that he was unable to answer orientation questions, he was moaning and yelling, could not focus or sit still. She charted his vital signs as

a range and noted that Mr. Garland needed a medical assessment ASAP as he was potentially detoxing. Two hours later, the same nurse noted that Mr. Garland was confused, experiencing active visual hallucinations, but non combative. Despite his obviously worsening condition, this nurse did not take any steps to provide Mr. Garland with care or determine the cause of his symptoms. Later that night, deputies moved Mr. Garland to a restraint chair and shoved his head downward between his knees, putting extreme pressure on his chest and diaphragm, causing Mr. Garland to go limp. At the hospital, Mr. Garland was diagnosed with an anoxic brain injury from which he did not recover and subsequently passed away.

271. In its Order denying Turn Key's Motion to Dismiss the Court emphasized:

> [nurse] Janes allegedly was aware that Garland was moaning, yelling, and banging on the cell door, suggesting that he was in some discomfort. The pleading also alleges facts from which the court may infer that Janes subjectively knew that Garland's condition was deteriorating— specifically, that, at nine o'clock, Garland experienced symptoms of visual hallucinations and confusion that were not documented at the six o'clock hour. Finally, the Second Amended Complaint alleges that '[a]t no point did Janes . . . take any steps to provide [Garland] with any care despite the severe risk from unscreened detoxification, and despite actual knowledge that [Garland's] condition was worsening.' Taking these allegations as true and viewing them in the light most favorable to plaintiff, the Second Amended Complaint includes plausible allegations from which the court may infer that Janes knew of the risk that Garland's condition was worsening, resulting in increasingly severe symptoms, and chose to disregard it. Thus, the Second Amended Complaint states a plausible claim that Janes acted with deliberate indifference to Gardner's serious medical needs by recklessly failing to treat Garland properly.

56

*Bush v. Bowling*, No. 19-CV-00098-GKF-FHM, 2020 U.S. Dist. LEXIS 8495, at \*16-17 (N.D. Okla. Jan. 17, 2020).

272.    Upon information and belief, on August 20, 2017, Rebecca Royston was booked into the Bryan County Detention Center without an intake medical screening even though deputies observed her being unsteady on her feet and believed her to be highly intoxicated. Despite suspecting that Ms. Royston was intoxicated and knowing that there were no medical personnel on site, deputies placed Ms. Royston in an isolation cell, hog-tied her, and left. Shortly thereafter, deputies observed Ms. Royston banging her head against concrete. Rather than arranging for a medical assessment, deputies entered Ms. Royston's cell and put her in a football helmet so she wouldn't strike her head again while still in the hog-tie. When a Turn Key nurse finally saw Ms. Royston, she charted that she was unable to obtain vital signs, unable to communicate with the patient, and occasionally Ms. Royston's eyes would open and roll back. Despite knowing she had banged her head on concrete and observing Ms. Royston's obviously emergent condition, the nurse did nothing to secure higher level care, leaving Ms. Royston to languish on the ground, rolling side to side in extraordinary pain, for more than four hours, at which time security staff made the decision to send Ms. Royston to the hospital. A CT scan revealed Ms. Royston had suffered intercranial hemorrhaging, and the delay in care caused permanent and irreversible damage. Turn Key settled a lawsuit arising from the incident in 2021.

57

273.     Upon information and belief, 25 year old Caleb Lee died on September 24, 2017, as a result of a cardiopulmonary arrest after Turn Key medical staff at the Tulsa County Jail ignored his serious and worsening symptoms for days. When he was booked into the jail, staff noted that Mr. Lee was being treated at a methadone clinic daily and that, by then, it had been about 48 hours since his last dose. Turn Key staff knew that Mr. Lee also had cardiac disease, hypertension, and was already experiencing withdrawal. By his second day in the jail Mr. Lee was hallucinating, and over the course of the next several days his vital signs became abnormal. The onset of hallucinations and abnormal vital signs were clear signals that there was an underlying and emergent medical condition. Mr. Lee continued to deteriorate – he was not eating and was visibly shaking and delusional. Turn Key medical staff nonetheless canceled three follow up appointments and did not secure higher-level evaluation and treatment for Mr. Lee. Finally, the day before his death, detention officers moved Mr. Lee from his cell to the medical unit when he was found lying on the floor complaining of chest pain. He began convulsing and foaming at the mouth when he arrived at the medical unit, but medical personnel did not offer any treatment while Mr. Lee was convulsing. Mr. Lee was eventually transported to the hospital, where he died. A lawsuit alleging Turn Key medical staff were deliberately indifferent to Mr. Lee's serious medical needs was settled in February 2022.

274.     Upon information and belief, on October 17, 2017, Brenda Jean Sanders was booked into the Creek County Justice Center for outstanding warrants. While in

58

the jail and under the care and control of the Turn Key medical personnel, Ms. Sanders' health dangerously deteriorated. Medical personnel and jail staff noted that she had been suffering from diarrhea and her mental state had been rapidly declining for at least two to three weeks. As her health obviously and swiftly deteriorated, medical personnel never provided Ms. Sanders any care, nor did they ever even obtain her medical history. On or about November 20, 2016, a full 35 days after entering the Creek County Justice Center, Turn Key medical personnel and jail staff finally had Ms. Sanders transported to the hospital after she had become fully incapacitated and was on the brink of death. At the hospital Ms. Sanders was diagnosed with "severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, coagulopathy, anemia, and thrombocytopenia." Ms. Sanders died the day after her admittance to the hospital. A lawsuit alleging Turn Key medical staff were deliberately indifferent to Ms. Sanders' serious medical needs is ongoing.

275.   Upon information and belief, on October 30, 2018, Angela Yost died after six days of suffering without medical attention at the Ottawa County Jail. Medical staff at the jail were well-acquainted with Ms. Yost and were aware she had several serious medical conditions, including that she had recently been hospitalized for a poorly-healing wound, cellulitis, and DVT in her left leg. Still, she did not see a nurse and was not provided any medications for the first three days she was at the jail, even as her condition observably declined. During the first three days, Ms. Yost's pain in her left leg increased and the wound began to secrete a yellow discharge and foul

odor. She struggled to move, laid on the floor, and complained that she needed to be seen by a doctor and receive her medications. When Ms. Yost was finally assessed, the Turn Key nurse did not refer Ms. Yost to a higher level of care, or even make a plan for her to be seen by a doctor or NP, despite the fact that she had numerous and serious co-morbidities, had not received any medications for three days, and obviously had an active infection. Rather, the nurse informed a Nurse Practitioner of Ms. Yost's condition, and despite the NP's awareness that Ms. Yost had an active infection and serious comorbidities, she also did nothing. Ms. Yost continued to observably deteriorate over the next three days. On the morning of October 30, she was helped to the shower where she collapsed and was unresponsive. She was pronounced dead 17 minutes after she arrived at the emergency room. A lawsuit arising from her death was filed in 2020.

276.    On September 7, 2021, Amy Cross died of drug toxicity a couple days after she was booked at the Weld County Jail for a drug related charged. At the time of Ms. Cross' booking on September 3, 2021, the Weld County Jail health care workers, employed by Turn Key pursuant to its contract with the County Defendants, understood that Ms. Cross had a history of drug abuse and was likely to have overdose or withdrawal related medical issues. In fact, Ms. Cross smuggled a bag of methamphetamine inside her body into the Jail undetected. While Ms. Cross did not disclose that she had smuggled drugs inside of her, she did admit during her intake screening on September 3rd that she regularly used illegal drugs and described her

withdrawal symptoms during her intake. That same day, health care workers observed that Ms. Cross appeared agitated, fidgety, and had chills, an elevated pulse, chest pain, and tremors. When Ms. Cross was finally transported to medical, medical staff, including Defendant Brittanie Flores, evaluated Ms. Cross. Despite Ms. Cross exhibiting obvious symptoms of methamphetamine toxicity, overdose, and cardiac distress, and knowing that Ms. Cross was at serious risk of bodily injury or death without assessment and treatment, medical staff sent Ms. Cross back to housing. Ms. Cross' symptoms worsened, escalating to a medical emergency, and required that Ms. Cross be hospitalized. Instead, acting with extreme deliberate indifference, the Weld County Jail staff did not obtain medical care. She was left to rot in her cell where she died that night. A lawsuit arising from Ms. Cross' death was filed in 2022.

277.    In the Amy Cross case, U.S. District Court of Colorado Judge Domenico denied the Turn Key Defendants' Motion to Dismiss. The Order stated, among other things, "These cases [against Turn Key] across the United States paint a plausible picture that Turn Key delays medical care to inmates to reduce financial costs even at the occasional human cost of their inmates' lives." The Trial Court found that Plaintiffs had plausibly alleged a 42 U.S.C. § 1983 *Monell* claim against Turn Key, stating, in part,:

> Taking all the complaint's allegations as true, Turn Key has an unconstitutional policy of delaying inmates' medical care. The Estate hangs liability on three separate theories: a formal policy, an informal custom, and a failure to train. Without reaching the other two theories, I hold that the Estate plausibly alleges that Turn Key maintains a formal policy of delaying adequate healthcare to inmates…

61

The Estate does not rely merely on a conclusory allegation that the policy exists. It buttresses its allegation by identifying eighteen instances where Turn Key employees delayed care resulting in inmates suffering medical complications. Doc. 1 at ¶¶ 184-202 (alleging there were "at least a hundred"). Plaintiffs can plausibly allege unconstitutional policies using prior instances of the defendants' misconduct even if those allegations stem from nonparties…

The Estate adequately does so. The complaint lists specific characteristics for each of the eighteen cases like plaintiffs' names, circumstances of their incarceration and eventual medical complications, and the alleged misbehavior by Turn Key employees…

What matters is that she was experiencing toxicity, that she exhibited symptoms of toxicity, and, most importantly, that Turn Key nurses should have taken quicker action. The Estate plausibly alleges that Turn Key employees delayed hospitalizing Ms. Cross for her methamphetamine toxicity because of Turn Key's policy….

As the Estate's complaint plausibly alleges, Turn Key knew the risk that its custom could result in inmates' deaths or disabilities and continued the policy for ten years regardless. This policy, as alleged, caused Ms. Cross's death and violated her constitutional rights.

*The Estate of Amy Lynn Cross, et al., v. Turn Key Health Clinics, LLC, et al.*, Civil Action No. 1:22-cv-03143-DDD-NRN; Docket No. 61; (D. Colo. July 18, 2023).

278.    Almost exactly one year prior to Ms. Kline's death at the hands of Turn Key employees in Weld County, on June 22, 2022, Eusebio Castillo Rodriguez died in custody in jail in Union County, Arkansas, at a facility for which Turn Key was the contracted medical care provider. Similar to Ms. Kline, Turn Key employees knew that Mr. Rodriguez had a severe and progressing case of alcohol withdrawal syndrome, but they refused to either get him additional medical assistance or

administer an appropriate amount of withdrawal medication. Subsequently, in 2023 Mr. Rodriguez's estate and family filed a lawsuit against Turn Key and the county regarding his death, asserting civil rights violations: *Estate of Eusebio Castillo Rodriguez et al. v. Union County, Arkansas, et al.*, Case No. 1:23-cv-01006 (W.D. Ark.). In that case, the Estate submitted an expert report finding that Turn Key's conduct fell below the standard for medical providers for incarcerated individuals. The case is still pending.

279.    There have been multiple deaths in the Weld County Jail during the time that the Turn Key Defendants have been under contract to provide the medical care for the inmates there.

280.    Lisa Martinez died in the Weld County Jail of dehydration and pneumonia on May 1, 2022.  Ms. Martinez had been incarcerated in the Weld County Jail since January of 2022. An autopsy by the Weld County Coroner stated, in part, "Prior to being found unresponsive, the decedent had complained of being weak and unable to move on her own."

281.    On January 2, 2023, the 19th Judicial Critical Incident Response Team was requested to respond to the Weld County Jail for an in-custody death. A female inmate began having trouble breathing at approximately 6:40 a.m. An ambulance was requested, and the female inmate was transported to a local hospital where she was pronounced dead at 7:39 a.m. by hospital staff.

63

282.    On November 16, 2023, around 11:47 pm, an inmate at the Weld County jail experienced a medical emergency while in custody. The inmate was transported to the Northern Colorado Medical Center where they were pronounced deceased.

283.    The deliberately indifferent actions and inactions of all Defendants, as described above, was a cause of Ms. Kline's death.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Unconstitutional Medical Care
(Plaintiffs Kline and Estate of Kline v. Individual Medical Defendants)

284.    Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

285.    42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

286.    Ms. Kline was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

287.    Ms. Kline was a pre-trial detainee.

288.    As a pre-trial detainee, Ms. Kline was protected from deliberate indifference to her known serious medical needs by the Fourteenth Amendment. To the extent her status was considered a convicted inmate, Ms. Kline was protected

64

from deliberate indifference to her known serious medical needs by the Eighth Amendment.

289. Individual Medical Defendants, as private actors working in a jail, are not entitled to qualified immunity.

290. Each Individual Medical Defendant, at all times relevant hereto, was acting under color of state law.

291. As a result of the allegations contained in this Complaint, the Individual Medical Defendants are liable under 42 U.S.C. § 1983 for the violation of Mr. Kline's constitutional rights by acting with deliberate indifference to her serious medical needs and disregarding the excessive risks associated with her life-threatening medical condition, despite being expressly aware of her known serious medical needs and obvious need for the same.

292. All Individual Medical Defendants, upon information and belief, personally participated in the constitutional deprivations described herein.

293. The acts or omissions of the Individual Medical Defendants were the legal and proximate cause of Ms. Kline's death and her Estate's losses and injuries.

294. As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate of Kline has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, economic losses, loss of enjoyment of life, loss of relationships, suffering, pain, and other special damages.

65

295.    Plaintiff Estate of Kline is entitled to attorneys' fees and costs pursuant

to 42 U.S.C.§1988, prejudgment interest and costs as allowable by federal law.

296.    Plaintiff Estate of Kline is also entitled to punitive damages against

these Defendants, in that their actions were taken maliciously, willfully or with a

reckless or wanton disregard of the constitutional rights of Ms. Kline.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Policies, Customs, and Training
(Plaintiffs Kline and Estate of Kline v. Entity Defendants Turn Key, Weld County
Sheriff, and Weld County)

297.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as

if fully set forth herein.

298.    The Entity Defendants are described above.

299.    Plaintiff Estate of Kline brings this claim pursuant to *Monell v.*

*Department of Soc. Svcs.*, 436 U.S. 658 (1978) and the Tenth Circuit Court of

Appeals cases interpreting *Monell*.

300.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation,
custom or usage of any state or territory or the District of Columbia
subjects or causes to be subjected any citizen of the United States or
other person within the jurisdiction thereof to the deprivation of any
rights, privileges or immunities secured by the constitution and law
shall be liable to the party injured in an action at law, suit in equity, or
other appropriate proceeding for redress . . .

301.    At all relevant times, Defendants were acting under color of law.

302. Ms. Kline was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

303. Ms. Kline was a pre-trial detainee.

304. As a pre-trial detainee, Ms. Kline was protected from deliberate indifference to her known serious medical needs by the Fourteenth Amendment. To the extent her status was considered a convicted inmate, Ms. Kline was protected from deliberate indifference to her known serious medical needs by the Eighth Amendment.

305. The Weld County Defendants and the Turn Key Defendants are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent polices, which include customs and training.

306. The Weld County Defendants are sued for both their own conduct and because they are non-delegable liable for Turn Key's unconstitutional policies.

307. As described above, the Weld County Defendants had a widespread pattern, practice, and custom of failing to train its jail deputies in alcohol withdrawal and its sign and symptoms.

308. This failure occurred despite the Weld County Defendants' knowledge (as reflected in their written policies) that such training was obviously necessary to ensure the health and safety of the detainees at Weld County Jail.

67

309. The Entity Defendants had a widespread pattern, practice, and custom of failing to properly treat inmates with serious medical needs, routinely minimizing or ignoring their symptoms rather than providing appropriate medical attention.

310. Alarming deficiencies in screening, monitoring, and the adequate delivery of medical care were identified and otherwise known and obvious to the Entity Defendants for years prior to Ms. Kline's death.

311. Despite this knowledge, the Entity Defendants and their corporate officials chose not to rectify the problems, putting the lives of its incarcerated patients at risk, in part because of impermissible profit driven considerations affecting hospitalizations, diagnostic testing, and staffing.

312. Turn Key and Weld County also failed to adequately train personnel to recognize and respond to the serious medical needs of their patients.

313. In light of the duties assigned to health care workers, the need for more or different training and supervision of them was obvious, and the failure to do so by Turn Key was deliberately indifferent to the rights of the relevant public.

314. Given the responsibilities entrusted to healthcare workers, it was plainly necessary to provide additional or improved training and supervision. Turn Key's failure to do so demonstrated deliberate indifference to the rights of Ms. Kline and the other inmates in its care.

315. The Entity Defendants ratified the unconstitutional actions of their employees, agents, and/or subcontractors in connection with the violations suffered

68

by Ms. Kline by expressly or implicitly approving both the conduct and the basis for it.

316.    Weld County Defendants' and Turn Key Defendants' unconstitutional acts and omissions were the driving force behind the Individual Defendants' and Does Turn Key's unconstitutional conduct and constituted the legal and proximate cause of Ms. Kline's injuries and her Estate's losses.

317.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate of Kline has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, economic losses, loss of enjoyment of life, loss of relationships, suffering, pain, and other special damages, all in amounts to be proven at trial.

318.    Plaintiff Estate of Kline is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, prejudgment interest and costs as allowable by federal law.

319.    Plaintiff Estate of Kline is also entitled to punitive damages against Turn Key, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Ms. Kline.

### THIRD CLAIM FOR RELIEF
### C.R.S. § 13-21-131 – Deprivation of Rights
(Plaintiffs Kline and Estate of Kline v. John and Jane Doe 6-10, the Individual Deputy Defendants)

320.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

321.    The Individual Deputy Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers.

322.    The Individual Deputy Defendants are peace officers as defined by C.R.S. § 24-31-901(3) and employed by a local government and therefore subject to C.R.S. § 13-21-131.

323.    The Individual Deputy Defendants were employed by, contracted with, or acting on behalf of Weld County, and were responsible for the custody, care, or supervision of incarcerated individuals, including Ms. Kline.

324.    Ms. Kline had a protected interest under the Colorado Constitution against the deprivation of her rights, specifically the rights to be free from cruel and unusual punishment, to due process, and to equal protection of the laws.

325.    The Individual Deputy Defendants owed Ms. Kline a duty to be housed and cared for in a safe and constitutionally compliant manner, as required by Colorado law. This duty includes protecting and maintaining the basic health and well-being of individuals in their custody. See *Nieto v. State*, 952 P.2d 834, 839 (Colo. App. 1997), *aff'd in part, rev'd in part*, 993 P.2d 493 (Colo. 2000).

326.    The Individual Deputy Defendants, acting under color of state law and within the scope of their duties, were deliberately indifferent to Ms. Kline's known serious medical conditions and failed to provide any adequate monitoring or referrals for additional medical care.

70

327. As a result of the Individual Deputy Defendants' failure to provide Ms. Kline with adequate and necessary monitoring and medical care, Ms. Kline suffered serious medical distress and death.

328. Ms. Kline's death could have been prevented through the exercise of reasonable care and compliance with clearly established standards.

329. The Individual Deputy Defendants' conduct, including their deliberate indifference to Ms. Kline's serious medical needs, constituted a violation of her rights under Colorado law and gives rise to liability under § 13-21-131.

330. Plaintiff seeks all available relief, including compensatory damages, costs, attorney's fees, and any other relief permitted under § 13-21-131.

## FOURTH CLAIM FOR RELIEF
### Wrongful Death
(Plaintiff Heather Kline-Hill v. Turn Key Defendants and Individual Medical Defendants)

331. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

332. Plaintiff Heather Kline-Hill is the mother of Cassandra Kline.

333. Under C.R.S. § 13-21-201, Plaintiff Heather Kline-Hill is the proper party to bring this wrongful death action as Ms. Kline was unmarried and had no children.

71

334.    Turn Key is a private corporation that contracted with Weld County to provide medical care and health services to detainees at the Weld County Jail at the time of Ms. Kline's death.

335.    Turn Key is vicariously liable for negligent acts and omissions of their agents and employees, including those of Individual Defendants.

336.    Individual Medical Defendants are private individuals, not governmental actors, and are therefore not entitled to any immunity under the Colorado Governmental Immunity Act.

337.    Individual Medical Defendants, Thompson, Mast, Flores, Graham, and John and Jane Does 1-5, and any other medical care workers who interacted with Ms. Kline while being held at the Weld County Jail, had a duty to provide competent medical care to inmates, including Ms. Kline.

338.    Individual Medical Defendants, as healthcare providers, had a nurse–patient or nurse practitioner–patient relationship with Ms. Kline, or otherwise undertook to provide her medical care, and were acting within the scope of their employment.

339.    In providing care and treatment to Ms. Kline, Individual Medical Defendants owed Ms. Kline a duty to exercise the degree of care, skill, caution, diligence, and foresight expected of medical personnel under similar circumstances.

340.    Ms. Kline's death was a result of the Individual Medical Defendants' actions and omissions.

341.   Individual Medical Defendants breached their respective standards of care and were negligent in failing to properly assess, monitor, treat, and care for Ms. Kline, causing her death.

342.   Individual Medical Defendants were also statutorily obligated to provide adequate medical treatment and human care. Under C.R.S. § 16-3-401, "persons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment."

343.   Turn Key also had a duty to implement reasonable policies, ensure adequate staffing and resources, and exercise reasonable care in the training and supervision of healthcare personnel at the Weld County Jail. Turn Key breached that duty by failing to provide a system of care that ensured inmates received adequate medical attention and treatment.

344.   Individual Medical Defendants, upon information and belief, failed to follow the County Defendant's policies, procedures and guidelines.

345.   Individual Medical Defendants, upon information and belief, failed to follow Turn Key's policies, procedures and guidelines.

346.   As a direct and proximate result of Turn Key's own negligence in staffing, training and supervision, as well as vicariously for its' employees, Plaintiff Heather Kline-Hill has suffered damages, losses and injuries in an amount to be determined by the jury at trial.

## **PRAYER FOR RELIEF**

73

**WHEREFORE**, the Plaintiffs pray that the Court award against Defendants:

(a)    All available compensatory damages, including, but not limited to, all available damages for pain and suffering, physical, mental and emotional distress, and all other non- economic and economic damages available under the law;

(b)    Punitive damages on all claims as allowed by law and in an amount to be determined at trial against all Defendants;

(c)    Attorneys' fees, costs, expert witness fees, and all other items allowed by statute or rule;

(d)    Pre- and post-judgment interest as appropriate; and

(e)    Any further relief at law or equity that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38 and 39, Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted May 29, 2026.

**OGBORN MIHM, LLP**

*/s/ Clayton E. Wire*
Clayton E. Wire
Peter McClenahan
Taylor Ogborn
1700 Lincoln St., Ste. 2700

74

Denver, CO 80203
303-592-5900
CM/ECF Email:
Clayton.Wire@omtrial.com
Peter.McClenahan@omtrial.com
Taylor.Ogborn@omtrial.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2026, I electronically filed the foregoing **THIRD AMENDED COMPLAINT AND JURY DEMAND** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<i>s/ Jessa Boles</i>
Jessa Boles